Jeremiah F. Hallisey, Esq. (SBN 40001)
HALLISEY & JOHNSON, P.C.
300 Montgomery St., Ste. 538
San Francisco, CA 94104
Tel:   (415) 433-5300
Fax:   (415) 433-5342
E-Mail: jfhallisey@gmail.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MARY C. McDEVITT and PADRAIC J. BRENNAN, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> vs. <br><br> QUALCOMM INCORPORATED, a Delaware corporation, <br><br> Defendant. | Case No. <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF:** <br><br> 1. Section 2 of the Sherman Act, 15 U.S.C. § 2 <br><br> 2. Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et. seq.* <br><br> 3. Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* <br><br> **JURY TRIAL DEMAND** |

MARY C. McDEVITT and PADRAIC J. BRENNAN ("Plaintiffs"), on behalf of themselves and all others similarly situated (the "Class" as defined below), upon personal knowledge as to the facts pertaining to them and upon information and belief as to all other matters, bring this class action for damages, injunctive relief and other relief pursuant to federal antitrust laws and California antitrust, unfair competition, and consumer protection laws. Plaintiffs demand a trial by jury and allege as follows:

## I. NATURE OF THE ACTION

1. Defendant QUALCOMM INCORPORATED ("Qualcomm"), as the largest provider of mobile chips in the world, holds a monopolistic position in the market. This action is brought against Qualcomm for abusing this monopoly and, as a result, causing millions of consumers worldwide to pay supracompetitive prices for cellular devices containing their modems chipsets.

2. Plaintiffs are purchasers of products that use cellular technology such as Qualcomm's modem chipsets, including cellular telephones and computer tablets ("Cellular Devices"). Plaintiffs and the class of persons they seek to represent have been harmed by paying artificially inflated prices for the Cellular Devices they purchased. Qualcomm's unlawful conduct has not been only contained in the United States. Indeed, Qualcomm's anticompetitive conduct has been met with severe condemnation by regulators throughout the world.[1]

3. Essentially, Qualcomm has now "parlayed its pioneering role in cellular technology into a patent-licensing business that generates most of its profits. Qualcomm charges a royalty on nearly every smartphone made, whether or not the device uses its chips… [a]s a result, Qualcomm has reaped more than $50 billion in licensing revenues since 2000" (emphasis added).[2]

4. Plaintiffs bring this action on behalf of themselves and others similarly situated to recover for their injuries resulting from Qualcomm's violations of Section 2 of the Sherman Act, as well as violations of state antitrust and consumer protection laws, from January 17, 2013 through the present ("Class Period"). Plaintiffs seek monetary damages, injunctive relief, and any other available remedies to which they are entitled for Qualcomm's unlawful conduct.

---

[1] Just last month, the United States Federal Trade Commission ("**FTC**") filed an action against Qualcomm in this court challenging Qualcomm's abuse of their modem chipset market monopoly and alleging that Qualcomm has excluded competitors and harmed competition – resulting in increased prices paid by consumers of cellphones and tablets. *See Federal Trade Commission v. Qualcomm Inc.*, Case No. 17-cv-00220 (filed N.D. Cal. Jan. 17, 2017) ("FTC Complaint").

[2] Don Clark's "Qualcomm's Main Profit Driver is Under Pressure," by The Wall Street Journal (Apr. 13, 2015) at https://www.wsj.com/articles/qualcomms-main-profit-driver-is-under-pressure-1428967051 (last accessed on February 20, 2017).

## II. PARTIES

### A. Plaintiffs

5. (a) Plaintiff MARY C. McDEVITT is a California resident who purchased an *Apple iPhone 6* and an *Apple iPhone 7*, each containing a Qualcomm modem chipset, which is similar to all *iPhone 6* and *iPhone 7* models subjected to having a Qualcomm modem chipset, during the respective Class Period for her own use and not for resale. Plaintiff has been injured in California and is threatened with further injury because she paid a higher price than she would have in the absence of Defendant's conduct as alleged herein.

(b) Plaintiff PADRAIC BRENNAN is a California resident who purchased an *iPhone 7 Plus* containing a Qualcomm modem chipset, which is similar to all *iPhone 7 Plus* models subjected to having a Qualcomm modem chipset, during the respective Class Period for his own use and not for resale. Plaintiff has been injured in California and is threatened with further injury because he paid a higher price than he would have in the absence of Defendant's conduct as alleged herein.

### B. Defendant

6. Defendant QUALCOMM INCORPORATED ("**Qualcomm**") is a Delaware corporation having its principal place of business at 5775 Morehouse Drive, San Diego, California 92121. Qualcomm is an American multinational semiconductor and telecommunications equipment company that designs and markets wireless telecommunications products and services. Qualcomm regularly conducts business in this district and many of its licensees are also located in this District.

## III. JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and 28 U.S.C. §§ 1331 and 1137. This Court also has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. § 1332(d) and 1367, in that: (i) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Class are citizens of a state different from some defendants; and (ii) Plaintiffs' state law claims

form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

8. Venue is proper in this Court pursuant to Section 12 of the Clayton Act, 15 U.S.C. §22 and 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and Qualcomm transacts business and maintains facilities in this District and thus is subject to personal jurisdiction here. Qualcomm is engaged in interstate commerce, and its activities, including those activities that form the basis of this Complaint, substantially impact interstate commerce.

## IV. INTRADISTRICT ASSIGNMENT

9. Pursuant to the Northern District of California's Civil Local Rule 3-2(c) – (e), the intradistrict assignment should be to the San Jose division. This action arises in Santa Clara County because a substantial part of the events giving rise to these claims occurred in Santa Clara County. Qualcomm, as well as third parties including various OEMs, also have offices in San Jose, Santa Clara, or both. The FTC also filed a case in the San Jose Division concerning the practices at issue here. *Federal Trade Commission v. Qualcomm Inc.,* Case No. 17-cv-00220 (filed N.D. Cal. Jan. 17, 2017).

## V. FACTUAL ALLEGATIONS

### A. Brief Overview of SSOs and SEPs

10. The critical performance factors of an electronic product are interoperability and compatibility. In order for this to be accomplished, all Cellular Devices contain a modem chipset – the essential component that allows the device to effectively communicate and transmit voice and data across wireless networks such as Verizon or Sprint.

11. In the background, standard setting organizations ("SSOs"), comprised of device and device component developers as well as others, collaborate to set technology requirements to ensure mass interoperability amongst all system components. Since there are so many device designers, component manufacturers, and others involved in the process, every participant in the

process must follow uniform standards to ensure the smooth transmission of data between the cellular network and the cellular devices that connect to it.

12. In setting these universal standards for parties to follow, SSOs declare patents that might be essential to those standards ("standard essential patents" or "SEPs"). SEP holders benefit by obtaining licensing fees and royalties associated with use of their technology – use of which is required in order for their cellular product to be interoperable.

13. Once incorporated and widely adopted, that technology is used not always because it is the best or the only option, but because the use of that technology has become necessary in order to comply with the agreed-upon standard. Therefore, SEP owners have tremendous power in that they have the ability to demand inflated royalties that, if abused, could severely limit competition, consumer choice, and innovation as a whole.

14. SSOs consider various alternative technologies before selecting a standard, and perhaps most importantly, SSOs also require that the developers of these standards agree to license their technology on fair, reasonable, and nondiscriminatory ("FRAND") term as a condition of the inclusion of the patented technology into the standard.

15. FRAND terms ensure that competitors may use the SEP's technology, and that device manufacturers may use the technology without being subjected to unilateral, unreasonable terms by the powerful SEP-holder. Indeed, SEP holders will often agree to FRAND terms because SSOs may exclude their technologies from the standard if they refuse to agree to FRAND terms. SEP holders also benefit from cooperating with the SSO through the license fees and royalties that flow in as a result of being the holder of an SEP implemented in a standard.

B. **Defendant Qualcomm's Abuse of Its Monopolistic Power In The Wireless Industry.**

1. **Qualcomm Has Historically Maintained A Powerful Patent Portfolio in Mobile CDMA and LTE Technologies.**

16. Virtually all wireless companies have patent licenses with Qualcomm, and one of the most profitable and lucrative portions of Qualcomm's patent portfolio is for CDMA technology (one of the main types of 2G and 3G standards).

17. Additionally, Qualcomm holds numerous patents related to this standard. As a result, nearly any company that manufacturers CDMA products—be they chipsets, phones, or infrastructure gear—must obtain a license from Qualcomm. Licensees pay a one-time fee to access Qualcomm's patent portfolio, and then pay royalties calculated on the final product sold by the licensee (*e.g.*, a tablet).

18. Qualcomm also led the way when Fourth Generation wireless systems were introduced ("4G" or "LTE") because Qualcomm exclusively supplies multimode CDMA-LTE chipsets that are backwards-compatible[3] with CDMA.

19. Lastly, proving to be ahead of the game again, Qualcomm is already beginning to create the foundation for the fifth generation wireless system ("5G"). States CEO Steve Mollenkopf: "While others have been talking about 5G, we have been creating it."[4]

### 2. Qualcomm's Violation of Its FRAND Promises.

20. In order to have their technology utilized in these standards, Qualcomm agreed to accept FRAND obligations – however, as numerous regulatory actions in countries around the world have confirmed[5], Qualcomm has not kept its FRAND obligations. Instead, the corporation has taken advantage of standard-setting process to acquire and maintain monopoly control of the modem chipset market.

21. Beginning at least as early as 2008, Qualcomm – among other incidences:

a) refused to license (or alternatively imposed onerous restrictions on licenses of) its SEPs to competing chipset makers;

b) conditioned the supply of its CDMA chipsets on agreeing to Qualcomm's entire patent portfolio's license agreements;

---

[3] Evolution of cellular communication does not simultaneously change communication standards at once because there are still users of handsets that use the old standard. It takes quite a bit of time to replace base stations and therefore, modem chipsets and handsets have to support not only new standards, but the old standards as well.

[4] Qualcomm's website at https://www.qualcomm.com/invention/5g. Last accessed on February 20, 2017.

[5] *See* Complaint at Section V(C), *supra*.

c) entered into exclusive deals with certain cellular phone manufacturers such as Apple, Inc. ("Apple"); and

d) most egregiously, ignored the requirements of SSOs to license its SEPs to patent users on FRAND terms in order to successfully extract unreasonably high, unilaterally-determined royalty payments

22. Qualcomm fraudulently induced the SSOs to utilize its technology in the cellular technology standards relevant to this action with the promise that they would abide by FRAND commitments. These promises were deceitful and fraudulent – upon SSOs and consumers alike – and prices of cellular devices were artificially inflated as a result of Qualcomm's unreasonable royalty demands.

23. Furthermore, with its power over CMDA technology, Qualcomm can and does use this as leverage to gain a greater share of the LTE-chipset market. Indeed, Qualcomm has leveraged its monopoly power over the supply of these chipsets to force device manufacturers into anticompetitive license agreements. Since these companies need CDMA- and LTE-based chipsets (which are controlled by Qualcomm) to be able to operate with CDMA- and LTE-based networks, device manufacturers have to accept unreasonable license terms as dictated by Qualcomm.

### 3. Qualcomm's Royalty Rates Are Much Higher Than Others' Rates.

24. Qualcomm's royalty rates of 5% for most CDMA products and 3.25% for more recent LTE-based products are significantly higher than others in the industry – indeed, its royalty rate is easily double that of a number of their competitor's rates.

25. Qualcomm's basis for which it calculates its rates is manipulative because instead of basing its royalty rates on the value of its contributing technology, Qualcomm bases its rates off of the wholesale price of the end product in its entirety – which is not a reasonable basis for calculating SEP-based royalties.

26. Indeed, certain SSOs have stated that a reasonable royalty should be the value attributable to a SEP. Therefore, it should be based on the value that the patented technology contributes to the "smallest salable component of the overall product."[6]

27. Qualcomm's power in the modem chipset market allows it to unfairly leverage that power to force licensees to pay inflated rates on an unreasonable rate basis, which results in an increased royalty payment that has nothing to do with the actual value attributable to Defendants' technologies and intellectual property – to the harm of all end-users of mobile devices throughout the world.

### C. Qualcomm's Antimonopolistic Conduct Has Been Condemned By Regulators Throughout the World.

28. Qualcomm's anticompetitive conduct has been met with severe condemnation and substantial fines by regulators around the world. In the last few years alone, Qualcomm's royalty and licensing practices have been investigated by competition regulators in China, South Korea, Taiwan, Japan, Europe, and the United States.

29. On February 9, 2015, Chinese authorities found Qualcomm's conduct violated China's Anti-Monopoly Law and imposed a record-breaking fine of $975 million. Qualcomm was also ordered to reduce its royalty calculation by basing it off of a portion of the wholesale price of the deice rather than the whole.

30. In July of 2009, the Korea Fair Trade Commission ("KFTC") fined Defendant Qualcomm US$208 million for abusing its dominant share of the chipset market and the SEP license market, and ordered the company to end its unfair licensing practices with respect to the same. Incredulously, Qualcomm was undeterred, and in December 2016, after a three-year investigation, the KFTC issued a decision imposing a fine of US$854 million against Defendant Qualcomm in its largest fine ever levied for limiting chip markers' access to its patents, and for coercing mobile-phone manufacturers into unfair license agreements by refusing to supply crucial phone chips to those that disagreed with its terms.

---

[6] "IEEE Amends its Patent (FRAND) Policy" by Dennis Crouch, PatentlyO (February 9, 2015) at http://patentlyo.com/patent/2015/02/amends-patent-policy.html. Last accessed on February 6, 2017.

31.     In December 2015, the Taiwan Fair Trade Commission ("TFTC") began its investigation into whether Qualcomm's licensing behavior violate the Taiwan Fair Trade Act and, among other things, whether Qualcomm's royalty charges are unreasonable.

32.     Most recently, as previously mentioned, the FTC filed an enforcement action in this Court seeking a permanent injunction against Defendant Qualcomm to undo and prevent its unfair methods of competition in or affecting commerce in violation of Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a). The FTC Complaint was filed on January 17, 2017, and alleged, among other things, that Qualcomm withheld its baseband processors unless a customer accepts a license to standard-essential patents on terms preferred by Qualcomm; continually refused to license its SEPs to its competitors, in direct violation of Qualcomm's FRAND commitments; and entered into exclusive dealing arrangements with companies such as Apple Inc., which denied other baseband processor suppliers the benefits of working with a significant cell phone manufacturer and hampered their development into effective competitors.

### D. Plaintiffs and the Classes Were Injured by Qualcomm's Monopolistic Conduct.

33.     Qualcomm's unlawful conduct has directly resulted in harm to Plaintiffs and the Class in that hundreds of millions of unsuspecting members of the Classes paid higher prices for their Cellular Devices than they would have in the absence of Qualcomm's monopolistic activity in an unregulated market.

34.     Qualcomm and Plaintiffs are all participants in the Cellular Device market. Plaintiffs are consumers of such devices, and Qualcomm licenses the critical technology required to operate these Cellular Devices – and forces monopoly rents tied directly to the entire wholesale price of the Cellular Devices at issue in this litigation. Without the licenses by Qualcomm, Plaintiffs are unable to use the Cellular Devices at issue in this litigation. Therefore, Qualcomm's anticompetitive acts directly increased the price of the Cellular Devices paid by Plaintiffs. Without the licenses by Qualcomm, Plaintiffs are unable to use the Cellular Devices at issue in this litigation.

35.     The patent rights owned by Qualcomm are inextricably intertwined with the Cellular Devices themselves—and the effect of the anticompetitive conduct at issue in this case is

targeted at the Cellular Device as a whole and not components thereof – as reflected by Qualcomm's calculating of their royalty based off of the entire price of the Cellular Device as a whole rather than simply the increase in value provided by their component piece.

36. As a result of Defendant's unlawful behavior, Plaintiffs and members of the Class have been forced to pay supra-competitive prices for Cellular Devices. Had Qualcomm not abused its monopoly power and instead charged a fair and reasonable royalty as their FRAND commitments called for, consumers throughout the world would have paid less for their Cellular Devices.

## VI. ANTITRUST INJURY

37. Defendant's unlawful abuse of its monopoly had the following effects, among others: (1) price competition has been restrained or eliminated with respect to Cellular Devices; (2) prices of Cellular Devices have been raised to artificially inflated levels; (3) purchasers of Cellular Devices have been deprived of free and open competition; and (4) purchasers of Cellular Devices – including Plaintiffs – paid artificially inflated prices.

38. During the Class Period, Plaintiffs and the Classes paid supra-competitive prices for Cellular Devices. By reason of the alleged violations of the antitrust laws, Plaintiffs and the Classes have sustained injury to their businesses or property, having paid higher prices for Cellular Devices than they would have paid in the absence of Defendant's conduct, and as a result have suffered damages. This is precisely the type of antitrust injury that the antitrust laws were meant to prevent and punish.

## VII. MARKET DEFINITION

39. The relevant geographic market for purposes for this action is the United States and its territories. The relevant product markets are:

(a) the CDMA and premium LTE modem chipset markets ("Modem Chipset Market"); and

(b) intellectual property rights associated with SEPs ("SEP Licensing Market).

40.     Qualcomm encumbers Cellular Devices through its licenses and related royalty fees, thereby directly participating in the market for the sale of Cellular Devices to Plaintiffs and Class Members.

## VIII. CLASS ACTION ALLEGATIONS

41.     Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure ("Rules") 23(a) and (b)(2), seeking damages, equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities in the United States who purchased, paid and/or provided reimbursement for some or all of the purchase price for CDMA- and/or premium LTE cellular devices ("Relevant Cellular Devices") for their own use and not for resale from January 17, 2013 through the present. This class excludes: (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities; and (c) any judges or justices involved in this action and any members of their immediate families or their staff.

42.     Alternatively to the claim for nationwide monetary relief under California law, Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages or monetary relief pursuant to California state antitrust, unfair competition, and consumer protection laws on behalf of the following class (the "Damages Class"):

> All persons and entities in the United States who purchased, paid and/or provided reimbursement for some or all of the purchase price for CDMA- and/or premium LTE cellular devices ("Relevant Cellular Devices") from January 17, 2013 through the present. This class excludes: (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for those who have purchased Relevant Cellular Devices; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

43.     The Nationwide Class and the Damages Class are referred to herein as the "Classes."

44. While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs logically believe there are millions of members in each Class given the sheer number of Cellular Device users in this day and age.

45. Common questions of law and fact exist as to all members of the Classes. Such questions of law and fact common to the Classes include (but are not limited to):

(a) Whether Qualcomm willfully acquired or maintained monopoly power over the Cellular Device Components in the United States during the Class Period;

(b) Whether Qualcomm possessed monopoly power in the Modem Chipset Market (underlying the Cellular Device Components) in the United States during the Class Period;

(c) Whether Qualcomm attempted to possess monopoly power in the modem chipset market (a critical market underlying the Cellular Device Components) in the United States during the Class Period;

(d) Whether Qualcomm possessed monopoly power in the SEP Licensing Market (for licenses critical to the technology underlying the Cellular Device Components) in the United States during the Class Period;

(e) Whether Qualcomm tied the sale of its SEPs with the purchase of its non-SEPs;

(f) Whether Qualcomm's acquisition and maintenance of its monopoly in the Cellular Device Components violated the Sherman Act, as alleged in the First Claim for Relief;

(g) Whether Qualcomm's conduct violated California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.*, as alleged in the Second Claim for Relief;

(h) Whether the conduct of Qualcomm, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(i) The effect of Qualcomm's unlawful conduct on the prices of Relevant Cellular Devices sold in the United States and its territories during the Class Period;

(j) The appropriate damages, injunctive and related equitable relief for the Nationwide Class; and

(k) The appropriate class-wide measure of damages for the Damages Class.

46.     Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs and all members of the Classes are similarly affected by Qualcomm's wrongful conduct in that they paid supracompetitive prices for Cellular Device purchases.

47.     Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are highly competent and experienced in the prosecution of antitrust and class action litigation.

48.     The questions of law and fact common to the members of the classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

49.     Class action treatment is the superior method for the fair and efficient adjudication of the controversy because such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would require. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Indeed, the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendant.

## IX.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

50.     Plaintiffs reference all the above allegations as if fully set forth herein.

51. Qualcomm's conduct, as alleged herein, constitutes unlawful monopolization of the market for Cellular Device Components, in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

52. Qualcomm has historically maintained monopoly power in the Modem Chipset Market. This is particularly significant because there are significant barriers to entry – giving competitors little to no chance to enter and compete to lower pricing against Defendant Qualcomm. Since Qualcomm controls the SEPs underlying CDMA technology and the market as a whole, Qualcomm has effectively to license to competitors and required purchasers of its chipsets to agree to its patent portfolio licenses. Qualcomm's terms are unreasonable and unlawfully violate its FRAND commitments at consumers' cost worldwide.

53. Qualcomm also holds a monopoly in the SEP Licensing Market. With SSOs implementing standards that utilize Qualcomm's technology – ***and with no other substitutes available after a standard is chosen*** – Qualcomm's chipsets have become critical for operability.

54. Having this market power over the SEP licensing market enables Qualcomm to leverage its control of its patents and force manufacturers to agree to unfair and unreasonable license agreements and terms – including excessive royalties.

55. Qualcomm has acquired and maintained its market power in the Cellular Device Components described above through anticompetitive means—among other things, excluding competitors and forcing manufacturers to agree to non-FRAND terms. Each relevant cellular device sold with or based on Qualcomm technology is also burdened by Qualcomm's exorbitant royalties – which in turn increases the cost of the device for consumers like Plaintiffs – and there is no procompetitive justification for the Qualcomm's anticompetitive conduct. Indeed, Qualcomm's acts have likely hindered the development of cellular technologies because it forced out competitors, innovation, and the possibility of competitive pricing.

56. In summary, Plaintiffs and the Class were harmed as a direct result of Qualcomm's conduct because it artificially increased the purchase price of their Relevant Cellular Devices.

## SECOND CLAIM FOR RELIEF

**Violations of the Cartwright Act; Cal. Bus. & Prof. Code §§ 16700, *et. seq.***

57. Plaintiffs reference all the above allegations as if fully set forth herein.

58. During the Class Period, Qualcomm engaged in monopolistic and anticompetitive conduct in unreasonable restraint of trade and commerce and in violation of California Business and Professions Code sections 16700, *et seq*. Despite its FRAND obligations, Qualcomm imposed royalty rates that were unreasonable and exceeded what it could have obtained in a true FRAND negotiation. This conduct constitutes a "combination" under the Cartwright Act.

59. Qualcomm established and carried out an unlawful scheme by which it acquired and maintained monopoly power in the modem chipset market and SEP licensing market through anticompetitive means, including by excluding competition.

60. The Relevant Cellular Devices at issue are commodities.

61. As a direct result of Qualcomm's unlawful conduct, Plaintiffs and the Class were overcharged when they purchased their Relevant Cellular Devices.

62. It is appropriate to apply California antitrust law to the Nationwide Class because Qualcomm is headquartered in California and Qualcomm subjected its competitors as well as manufacturers that reside and do business in California to its unlawful conduct. As a direct result, a large portion of Qualcomm's profits were derived from companies doing business in California.

## THIRD CLAIM FOR RELIEF

**Violations of Unfair Competition Law; Cal. Bus. & Prof. Code §§ 17200, et seq.**

63. Plaintiffs reference all the above allegations as if fully set forth herein.

64. Qualcomm's conduct constitutes a violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, which protects consumers from illegal, fraudulent and unfair business practices.

65. Plaintiffs bring this claim on behalf of themselves, the Damages Class, and on behalf of the public as private attorneys general pursuant to Cal. Bus. & Prof. Code § 17204.

Qualcomm's conduct constitutes violations of the Sherman Act and the Cartwright Act and therefore, constitute unlawful conduct under § 17200.

66. Qualcomm unlawfully acquired and maintained its monopoly over the Modem Chipset Market and SEP Licensing Market through anticompetitive conduct. Some examples include excluding competitors by refusing to license its technology to them; engaging in exclusive dealing arrangements with its customers to prevent other manufacturers from competing; and forcing manufacturers to license Qualcomm's entire patent portfolio for access to standard technology.

67. Qualcomm's conduct was deceptive because it induced SSOs to use its technology under the guise that it would comply with its FRAND obligations. However, after SSOs chose Qualcomm's technology to be implemented for their standards, Qualcomm broke its FRAND promises.

68. Qualcomm's conduct is unfair to Plaintiffs and members of the class because as a direct result of its acts described above, Plaintiffs were charged more for their Relevant Cellular Devices than they would have been but for Qualcomm's conduct.

69. Plaintiffs and the Class seek all forms of relief available under California's Unfair Competition Law. Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs and the Damages Class seek from Qualcomm restitution and the disgorgement of all earnings, profits, compensation, benefits and other ill-gotten gains obtained by Qualcomm as a result of its conduct in violation of Business & Professions Code § 17200 *et seq.*

70. It is appropriate to apply California antitrust law to the Nationwide Class because (1) Qualcomm is headquartered in California and (2) Qualcomm subjected its competitors (as well as handset companies) that reside in California to its unlawful conduct. As mentioned previously, this allowed Qualcomm to collect a large portion of its profits from companies doing business in California.

71. Pursuant to Business & Professions Code § 17204, Plaintiffs and the Damages Class seek an order of this Court enjoining Qualcomm from continuing to engage in the acts as set forth in this Complaint, which acts constitute violations of Business & Professions Code § 17200

*et seq.* Plaintiffs, the Class and the public will be irreparably harmed if such an order is not granted.

## X.   REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that:

1. The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to each and every member of the Class;

2. The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed an unreasonable restraint of trade or commerce in violation of Section 2 of the Sherman Act, and the state antitrust and consumer protection laws set forth herein;

3. Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Classes be entered against defendants in an amount to be trebled to the extent such laws permit;

4. Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

5. Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

6. Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits defendants obtained as a result of their acts of unfair competition;

7. Plaintiffs and members of the Classes be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

8. Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

9. Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

DATED: March 7, 2017

HALLISEY AND JOHNSON, P.C.

By *[signature]*
Jeremiah F. Hallisey
Attorneys for Plaintiffs

### JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Indirect Purchaser Plaintiffs demand a jury trial of all issues so triable.

DATED: March 7, 2017

HALLISEY AND JOHNSON, P.C.

By *[signature]*
Jeremiah F. Hallisey
Attorneys for Plaintiffs